UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARSHALL W. HENDERSON, | * | CIV 10-4116-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | OPINION AND ORDER |
| DR. ROYCE ENGSTROM, DR. | * | GRANTING MOTION FOR |
| JAMES S. KORCUSKA, DR. FRANK | * | SUMMARY JUDGMENT |
| MAIN, DR. GRACE A. MIMS, DR. | * | |
| KAREN OLMSTEAD, DR. SETH | * | |
| OLSON, DR. TAD PERRY, LINDA | * | |
| REETZ, DR. TERISA REMELIUS, and | * | |
| THE UNIVERSITY OF SOUTH | * | |
| DAKOTA, | * | |
| | * | |
| Defendants. | * | |

Plaintiff Marshall W. Henderson ("Henderson") sued Defendants Dr. Royce Engstrom,

Dr. James S. Korcuska, Dr. Frank Main, Dr. Grace A. Mims, Dr. Karen Olmstead, Dr. Seth

Olson, Dr. Tad Perry, Linda Reetz, Dr. Terisa Remelius, and The University of South Dakota

("USD") seeking damages for what Henderson alleges to be an improper dismissal from his

graduate studies at USD. Defendants have filed a motion for summary judgment, which this

Court grants through this Opinion and Order.

## I. Facts in light most favorable to Henderson

In ruling on the motion for summary judgment filed by the Defendants, this Court must

resolve genuine disputes as to any material fact in favor of Henderson. See Fed. R. Civ. P. 56.

Thus, this Court takes the facts primarily from the Plaintiff's Response to Defendants' Statement

of Material Facts. Doc. 75.

Henderson enrolled in the Community Agency Counseling Program at USD's Graduate School in 2003. Doc. 75 at ¶ 1. USD had granted Henderson testing and lecture accommodations due to his dyslexia. Id. at ¶ 24. In December of 2005,[1] Henderson, as part of his pursuit of a degree from USD, identified Keystone Outpatient Treatment Facility ("Keystone") in Sioux Falls as his proposed internship location. Id. at ¶ 5. At that time, Henderson signed an internship plan and application form which stated that he had read and understood the separation policy—namely that early separation "requires written approval of the campus internship coordinator, the site supervisor and the program coordinator." Id. at ¶¶ 6-7.

Henderson began his internship at Keystone, but quickly realized that the internship was not the experience he sought. Doc. 75 at ¶ 11; Ex. G. Henderson's last day at Keystone was February 17, 2006. Ex. G. On February 27, 2006, Henderson accepted an internship with Heuermann Clinic in Sioux Falls. Id. Also on February 27, 2006, Defendant Dr. Seth Olson, USD's internship coordinator, emailed Henderson to schedule a required internship site visit. Id. 75 at ¶ 8. Having learned of Henderson's change in internships, Dr. Olson informed Henderson in March of 2006 that Henderson would need to contact his supervisor from Keystone as part of the separation procedure. Id. at ¶ 14. Henderson responded to Dr. Olson with a written explanation of why he left Keystone and sent a letter to the Keystone supervisor thanking him for the internship opportunity. Id. at ¶¶ 12-13.

On March 23, 2006, Henderson met with Dr. Olson to discuss the early separation procedures. Doc. 75 at ¶ 8. At this meeting, Dr. Olson agreed to help Henderson through the

---

[1]Defendants note this date as December of 2006 (Doc. 65 at ¶ 5), but Henderson explains that he was "so upset, hurried, and flustered" when signing the form that he accidentally misdated the form as 2006 rather than 2005. Doc. 75 at ¶ 5.

remaining separation procedures, but Henderson believes that Dr. Olson never provided the promised support. Id. Dr. Olson informed Henderson that until the early separation procedures were completed, Henderson could not receive credit for the internship at Heuermann Clinic. Id. at ¶ 11. Dr. Olson advised Henderson to stay at Heuermann Clinic and become familiar with the facility. Id. Henderson thus believed that the new internship was started with the approval of Dr. Olson. Id. Also, during the meeting on March 23, 2006, Dr. Olson reviewed a journal written by Henderson for a class requirement. Doc. 75 at ¶¶ 15-16. Henderson's journal entry for March 7, 2006 chronicled how Henderson experienced unwanted client-initiated sexual contact at Keystone on or about February, 8, 2006. Id. at ¶ 15. Henderson told Dr. Olson that he had reported the incident to Keystone in February. Id. at ¶ 17.

On April 5, 2006, Henderson met with Dr. Olson and Dr. James Korcuska to discuss his clinical performance. Doc. 75 at ¶ 20. According to the Defendants, Dr. Olson had contacted Keystone and was informed that Henderson had frequent absences and had not filed a grievance at Keystone. Id. After the April 5 meeting, Dr. Olson informed Henderson by voicemail that he would receive an "F" for his internship credits and was subject to dismissal from the graduate program for failing to follow the early separation procedures. Id. at ¶ 21.

On April 26, 2006, Henderson filed a grievance with Roberta Hakl, the Director of USD's Equal Opportunity and Diversity Office. Doc. 75 at ¶ 23. Henderson claimed in his grievance that he was being singled out for abusive treatment by Dr. Olson and Dr. Korcuska because of Henderson's disability of dyslexia, prior felony conviction, and sexual orientation. Id. at ¶ 24. Henderson believes these factors improperly contributed to Dr. Olson's grading assessment. Id.

Dr. Olson provided formal written notice to Henderson that he would receive a failing grade for the internship course on April 27, 2006. Id. at ¶ 25. Dr. Olson wrote that the failing

3

grade was based on Henderson's failure to follow the "letter and spirit of the policies and procedures related to early separation from an approved internship site." Id. at ¶ 26. Henderson maintains that he was being dismissed from the program because of his disability. Id.

Dr. Grace Mims then was appointed as Henderson's faculty advisor. Doc. 75 at ¶ 27. Hakl handled Henderson's allegations of discrimination, while Dr. Frank Main handled his grievance filed in relation to his grades and whether he would be dismissed from USD. Id. at ¶ 28. Dr. Main assigned Henderson temporary incompletes in the internship courses pending his evaluation. Id. at ¶ 29. On May 4, 2006, Dr. Main met with Henderson, Dr. Mims, USD's Disability Services Officer Ernetta Fox, and Rita Humphry. Id. Henderson did not receive a list of questions before the meeting, which Henderson submits violated his disability accommodation requirement. Id. at ¶¶ 31, 37. Dr. Main presented findings during the meeting, including that Keystone disputed Henderson's claim about a lack of proper supervision and clinical hours and that Keystone had no knowledge of any alleged sexual incident involving Henderson. Id. at ¶ 32. Henderson claims that Keystone lost the materials pertaining to the incident and failed to provide Henderson with a copy of the incident report. Id. at ¶ 33. At the meeting, Dr. Main asked Henderson to provide the name of the perpetrator of the alleged sexual incident, but Henderson refused to do so at the time. Later, Henderson provided Dr. Main the name of a Keystone counselor to whom Henderson had reported the incident. Id. at ¶ 33.

Also on May 4, 2006, Henderson emailed Dr. Main asking to withdraw his grievance because he had registered to retake the internship courses during the 2006 summer session. Doc. 75 at ¶ 36. Henderson says that he withdrew his grievance only after Dr. Main threatened to

4

expel both Henderson and his partner[2] if Henderson did not withdraw the grievance. Id. Dr. Main responded to Henderson's email by notifying Henderson of a list of remedial steps required to complete the internship process.

On May 9, 2006, Henderson met with Dr. Main, Dr. Mims, and Ms. Humphrey to discuss the remedial plan. Doc. 75 at ¶ 38. Henderson was permitted to record the meeting, but was unable to do so to because of an absence of such technology in the particular room. Id. Henderson maintains that no remedial steps were provided during this meeting, and that Dr. Main again threatened to remove both Henderson and his partner from USD if Henderson did not provide additional information. Id. According to the Defendants, during this meeting, Henderson corrected his previous statement about a Keystone facilitator having informed him that the client who initiated unwanted sexual contact with Henderson had done so at other facilities; Henderson then said that it was his partner who had told him so. Ex. HH4 at 4. Henderson contests that he ever made such a statement. Dr. Main informed Henderson that discussing a client with his partner was a serious breach of professional ethics by both Henderson and his partner. Id. at 4-7.

In a letter dated June 9, 2006, Dr. Main recommended that Henderson receive failing grades for his internship courses and that faculty meet early to provide Henderson a biannual review of his status in the program. Ex. P. On July 13, 2006, Dr. Main, Dr. Mims, Dr. Olson, and Dr. Korcuska met to evaluate Henderson's performance as a counseling student. Doc. 75 at ¶ 43. Henderson was not informed of the meeting nor was he offered an opportunity to further

---

[2]Henderson's partner was in a doctorate program in Educational Psychology at the time and Dr. Main was chair over that doctorate program. Doc. 75 at ¶ 38. Henderson's partner has since finished his doctorate at USD. Id. at ¶ 39.

defend himself. Id. In a letter dated July 18, 2006, Dr. Korcuska informed Henderson that the faculty had decided to dismiss Henderson from USD's community counseling program, citing Henderson's "unethical and unprofessional behavior" as "inconsistent with the values and ethics of the Counseling Profession." Ex. Q. Henderson was formally dismissed from USD's Graduate School on July 19, 2006. Doc. 75 at ¶ 45. Henderson appealed his dismissal through several grievance steps at USD, but his dismissal was affirmed at all levels. Doc. 75 at ¶ 46.

Henderson filed a Complaint on August 23, 2010, alleging violations of the Individuals with Disabilities Education Act (IDEA), the Family Educational Rights and Privacy Act (FERPA), Title IX of the Education Amendments of 1972, and Title II of the Americans with Disabilities Act (ADA). Henderson's Complaint also made state-law claims for breach of contract, harassment, and "educational malpractice," which Henderson plead as being analogous to a breach of fiduciary duty. Doc. 1. After the completion of discovery, Defendants filed a motion for summary judgment. Doc. 64.

## II. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans,

647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

### III. Sovereign Immunity Defense

Defendants contend that Henderson's claims against USD should be dismissed because USD has sovereign immunity. Doc. 66. Henderson sues the School of Education at The University of South Dakota and insists "USD is NOT a defendant." Doc. 74 at 2. However, Henderson concedes that the "S[chool] of Ed[ucation] is not separately established" under South Dakota law. Id. Because the School of Education is not a separate entity from USD, this Court construes the Complaint to be against USD, the recognizable entity that includes the School of Education. See S.D. Codified Laws ("SDCL") § 13-57-1; cf., Lundquist v. University of South Dakota Sanford School of Medicine, 2011 WL 5326074, at *6-7 (D.S.D. Nov. 4, 2011) (holding USD's School of Medicine is entitled to sovereign immunity afforded to USD under SDCL).

USD maintains that it does not have the capacity to sue or be sued under South Dakota law. Rule 17(b)(3) of the Federal Rules of Civil Procedure provides that the capacity of an entity like USD to sue and be sued is determined "by the law of the state where the court is located." Under the South Dakota Constitution, the South Dakota legislature "shall direct by law in what manner and in what courts suits may be brought against the state." S.D. Const. Art. II § 27. The South Dakota legislature established USD as a state-sponsored university and placed USD under the control of the South Dakota Board of Regents. SDCL § 13-57-1. Nothing in SDCL § 13-57 gives USD the ability to sue or be sued. Rather, the Board of Regents, which controls USD, has the power to sue and be sued under SDCL § 13-49-11. Lundquist, 2011 WL 5326074, at *7; see

also Pushkin v. South Dakota State University, 2010 WL 5089480 at \*1 (Dec. 8, 2010) (reaching the same conclusion as to South Dakota State University under similar statutes at SDCL § 13-58).

Henderson also sues a number of individual Defendants employed with USD, but does not plead whether he is suing them in their personal or official capacities. Doc. 1. In opposing summary judgment, Henderson asserts that Dr. Main "evaded service from the U.S. Marshall's [sic] office" and thus allegedly "understood he was being sued as an individual." Doc. 75 at 35; see also Ex. II1. Henderson also asserts that he is suing the individual Defendants as "individuals," but makes no claim that any of the individual Defendants undertook actions toward Henderson outside of their conduct as USD employees. See Doc.1; Doc. 74 at 3.

In the Eighth Circuit "absent a clear statement that officials are being sued in their personal capacities," a complaint under § 1983 is interpreted as including only official capacity claims. Murphy v. State of Arkansas, 127 F.3d 750, 754 (8th Cir. 1997); see also Nix v. Norman, 879 F.2d 429, 430-31 (8th Cir. 1989). Pro se complaints are held to less stringent standards than pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). But pro se litigants must still comply with the Federal Rules of Civil Procedure. Quam v. Minnehaha County Jail, 821 F.2d 522, 522 (8th Cir. 1987). Rule 9(a)(1) of the Federal Rules of Civil Procedure provides, "*Except when required to show that the court has jurisdiction*, a pleading need not allege a party's capacity to sue or be sued." Fed. R. Civ. P 9(a)(1)(A) (emphasis added). The Eleventh Amendment presents a jurisdictional limit on federal courts in civil rights cases against states and their employees. Rose v. State of Nebraska, 748 F.2d 1258, 1262 (8th Cir. 1984) (citing Edelman v. Jordan, 415 U.S. 651, 678 (1974)). Thus, under Rule 9(a), Henderson should have made a capacity allegation in the complaint. See Nix, 879 F.2d at

8

431. Because he did not do so, and because the individual Defendants all undertook action in the course and scope of their employment for USD, this Court construes Henderson's Complaint as solely alleging claims against individual Defendants in their official capacities.

The Eleventh Amendment to the United States Constitution bars actions against states and state officials in their official capacity. Alden v. Maine, 527 U.S. 706 (1999); Cory v. White, 457 U.S. 85, 91 (1982); Ford Motor Co. v. Indiana Dep't of the Treasury, 323 U.S. 459 (1945) (overruled on other grounds). The Eleventh Amendment bars Henderson's claims against the individual Defendants for money damages. Alden, 527 U.S. at 756–57. They are therefore entitled to summary judgment on all claims for money damages.

In short, summary judgment is appropriate because USD does not have the capacity to sue or be sued. Rather, Henderson should have named or sought to substitute the South Dakota Board of Regents as the appropriate institutional defendant in this case. Because neither USD nor the individual Defendants are liable for money damages, the Defendants have immunity as to nearly all of Henderson's Complaint and prayer for relief. Although Henderson primarily seeks money damages, his prayer also seeks other "just and equitable" relief, so this Court will address whether summary judgment on the merits of the case should enter.

**IV. Summary Judgment on the Merits**

Henderson made eight separate claims in his Complaint: (1) violation of contract; (2) lack of procedural due process; (3) violation of ADA accommodations; (4) harassment of students; (5) misuse of Title IX protocols in investigating sexual harassment charges; (6) FERPA violations; (7) educational malpractice; and (8) barring from readmission into an alternate program at USD. Doc. 1. This Court will consider each claim separately to determine whether there are any genuine issues of material fact for trial.

9

## A. Count 1: Breach of Contract

Henderson contends that Defendants breached a contract with him because Dr. Korcuska provided no leads in helping Henderson find a second internship, no list of pre-approved internship sites was available, the Keystone Supervisor did not attend meetings, and procedural errors were made during Henderson's contestation of dismissal. Doc. 1 at ¶¶ 108-115. Henderson alleges similar procedural errors in Count II under his due process claims.

South Dakota law governs Henderson's breach of contract claim. In general, the relationship between a student and a university is contractual in nature. Aase v. State of South Dakota, 400 N.W.2d 269, 270 (S.D. 1987); Corso v. Creighton Univ., 731 F.2d 529 (8th Cir. 1984); 15A Am. Jur. 2d Colleges and Universities § 25. Under South Dakota law, "[a]n action for breach of contract requires proof of an enforceable promise, its breach, and damages." Morris, Inc. v. State, ex rel. State Dept. of Transp., 2011 SD 85 at ¶ 34, 806 N.W.2d 894, 903 (citing McKie v. Huntley, 2000 SD 160, ¶ 17, 620 N.W.2d 599, 603). Little South Dakota law describes what constitutes the terms of the contract between a university and its students. The cases cited by Henderson, however, provide limited guidance on what particular documents provide the details of a contract between a student and a college. See Lerner v. Ravenswood Hosp. Med. Ctr., 1999 WL 1267710, at *7 (N.D. Ill. Nov. 10, 1999) (discussing contracts claims arising from a handbook under Illinois state law); see also Coddington v. Adelphi Univ., 45 F. Supp. 2d 211, 219 (E.D.N.Y. 1999) (dismissing a breach of contract claim based on school bulletins because no consideration existed); Govan v. Trustees of Boston Univ., 66 F. Supp. 2d 74, 82 (D. Mass. 1999) (discussing need for caution when adjudicating contract claims between students and colleges); Zumbrun v. Univ. of Southern California, 25 Cal. App. 3d 1, 15 (Cal. Ct. App. 1972) (allowing plaintiff to file an amended complaint on a claim that contract was

10

breached when a professor elected to not complete a course offered by the university); <u>Mangla v. Brown Univ.</u>, 135 F.3d 80, 85 (1st Cir. 1998) (holding that university was not contractually obligated to confer degree status or admit student to degree program based on promissory estoppel).

Henderson's claims of breach of contract center on his dissatisfaction with USD's internship program. The M.A. Intern's Handbook ("the Handbook"), on which Henderson relies for his breach of contract claim, specifically informs students about how they can, for themselves, find an appropriate internship. Ex. A at 11. The Handbook states that it is the students' duty to "[h]it the pavement; pick up the phone." <u>Id.</u> Neither Dr. Korcuska nor any other employee of USD was legally required to find a second internship for Henderson. Henderson has failed to show any other document or contract that would require Dr. Korcuska or anyone at USD to find for him a second internship.

The Handbook informs students that they "may purchase *The Internship Site Directory* ... in the bookstore. This directory lists sites where interns have previously accepted positions." Ex. A at 11. The Handbook also informs students they can check the "postings in the outer office of 210 Delzell." <u>Id.</u> Henderson contends that *The Internship Site Directory* did not exist at the bookstore. However, even if this were somehow a breach of contract, Henderson has shown no damage. The Handbook had informed Henderson that it was his duty to seek out an internship placement. Ex. A at 11. Henderson found an internship at Keystone and then, after quitting Keystone, found a second internship at Heuermann Clinic. Henderson has alleged no damages stemming from not being able to access the list of prior internships at the bookstore and sustained no damages. <u>Morris, Inc.</u>, 2011 SD 85 at ¶ 34, 806 N.W.2d at 903.

11

Henderson has no claim that these Defendants breached a contract based on a Keystone supervisor, who is neither a defendant nor a USD employee, failing to attend a meeting. Henderson's claims regarding the procedure used in his dismissal do not derive from contractual provisions, but from due process protection. Therefore, Henderson has no viable claim for breach of contract.

### B.  Count 2:  Lack of Due Process

Henderson next claims that the Defendants violated his due process rights by failing to follow appropriate procedures. Henderson describes the due process violations as follows:

> Plaintiff was denied access to his own student records, denied access to records of proceedings against him, denied access to accusers during their testimony, denied access to records of complaints against him, denied the right to tape record conversations and proceedings that were pertinent to the process of dismissal, denied a fair hearing at the meeting of the South Dakota Board of Regents which was his right and he had requested properly.  Procedures were altered during his grievance process in an attempt to block his progress to a reversal of the dismissal decision. The plaintiff never received a detailed and written listing of the charges against him that resulted in dismissal, the plaintiff requested listing of questions to be asked of him prior to meetings in order to have appropriate documentation and was denied this right.

Doc. 1 at 50-51.

Henderson was entitled to due process protection in an expulsion proceeding. See Goss v. Lopez, 419 U.S. 565, 576 (1975) (holding that a student facing a ten-day scholastic suspension was entitled to due process). Different due process requirements exist for disciplinary dismissals and academic dismissals. The Eighth Circuit's due process requirements in the school setting for a disciplinary dismissal are that:

> [P]rocedural due process must be afforded a student on the college campus "by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures."  But, also, we have cautioned "that it is not sound

12

> to draw any analogy between student discipline and criminal procedure.
> . . ."

Woodis v. Westark Community College, 160 F.3d 435, 440 (1998) (citing Jones v. Snead, 431 F.2d 1115, 1117 (8th Cir. 1970)). Students do not shed their constitutional rights at the schoolhouse door, but flexibility is required in school disciplinary procedures in order to maintain security and order in the schools. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506 (1969); New Jersey v. T.L.O., 469 U.S. 325, 340 (1985).

There is even more flexibility granted to schools when a student is dismissed for academic rather than disciplinary reasons. There are "significant difference[s] between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal." Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 86 (1978). To satisfy the Fourteenth Amendment, the Eighth Circuit only requires that "a student who is dismissed for academic reasons from a public university must be afforded notice of faculty dissatisfaction and potential dismissal, and the dismissal decision must be careful and deliberate." Richmond v. Fowlkes, 228 F.3d 854, 857 (8th Cir. 2000). "A formal hearing is not required for an academic dismissal." Id.

Defendants contend that Henderson was dismissed for academic rather than disciplinary reasons, but Henderson disagrees. This determination is important as "[t]here is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals." Horowitz, 435 U.S. at 87 n.4 (quoting Mahavongsanan v. Hall, 529 F.2d 448, 450 (5th Cir. 1976)). A disciplinary dismissal is usually based on a student's misconduct. Horowitz, 435 U.S. at 86-87. It is an objective determination and not "dependent upon the analytical

13

expertise of professional academicians." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569 (1972). Disciplinary decisions bear a "resemblance to traditional judicial and administrative fact finding." Id. When a student is compelled by a university's rule, order, or law to do something and is discharged for failing to do as ordered, the discharge is disciplinary. Mauriello v. Univ. of Med. & Dentistry, 781 F.2d 46, 50 (3d Cir. 1986). Disciplinary dismissals "are those involving the violation by a student of valid rules of conduct." Fenje v. Feld, 398 F.3d 620, 625 (7th Cir. 2005) (citing Horowitz, 435 U.S. at 86).

An academic dismissal by contrast arises from a student's failure to meet academic standards. Horowitz, 435 U.S. at 86. Academic dismissals usually occur when there are problems with the student's grades, an inability to perform the work, poor class attendance, or other academic failings. Roach v. Univ. of Utah, 968 F.Supp. 1446, 1453 (D. Utah 1997); see also Richmond, 228 F.3d at 857–58 (upholding an academic dismissal of a pharmacy student who received three negative non-cognitive evaluations when the university policy allowed dismissal after two negative evaluations); Ikpeazu v. Univ. of Neb., 775 F.2d 250, 253–55 (8th Cir. 1985) (upholding an academic dismissal of a pharmacy graduate student when he failed two of his four required clerkships); Hines v. Rinker, 667 F.2d 699, 704 (8th Cir. 1981) (upholding an academic dismissal of a medical student after he received a failing grade in internal medicine when he had already received a prior academic dismissal).

Students' ethical violations are disciplinary and not academic in nature. See Butler v. Rector & Bd. of Visitors of Coll. of William & Mary, 121 Fed. Appx. 515, 519 n.2 (4th Cir. 2005) (assuming that a university student accused of cheating had been dismissed for disciplinary reasons); Nash v. Auburn Univ., 812 F.2d 655, 658–59 (11th Cir. 1987) (reasoning that cheating in violation of the Student Code of Professional Ethics was a disciplinary dismissal); cf.

14

Mauriello v. Univ. of Med. and Dentistry of New Jersey, 781 F.2d 46, 50 (3rd Cir. 1986) (finding that a university student was dismissed for academic problems because the issue was on the quality of her research, not ethical violations in her research). Being accused of an ethical violation carries a stigma and threatens a person's future career prospects. See, e.g., Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 311 (4th Cir. 2006) (reasoning that a university stigmatized an administrator when the university blamed him for the school's NCAA regulations' violations). "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Roth, 408 U.S. at 573. Even in an academic dismissal, if that dismissal carries a stigma, the Eighth Circuit requires notice of all allegations lodged against the student and the opportunity to appear in person to tell her side of the story. Greenhill v. Bailey, 519 F.2d 5, 8 (8th Cir. 1975).

The parties disagree as to why Henderson was ultimately dismissed from USD. It appears that ethical or disciplinary violations—not following the early separation procedures and allegedly sharing client information with his partner—joined with academic reasons—the "F" grade for the internship—to cause the dismissal. Taking the facts in the light most favorable to Henderson, this Court concludes that the heightened due process requirements for dismissal for disciplinary reasons should apply to determining if the Defendants are entitled to summary judgment.

"Given the flexibility afforded schools in this area, [a court] must 'enter the realm of school discipline with caution.'" Woodis, 160 F.3d at 438 (quoting Stephenson v. Davenport Cmty. Sch. Dist., 110 F.3d 1303, 1306 (8th Cir. 1997)). This Court must use "care and restraint" in reviewing USD's decision to terminate Henderson's enrollment at the school. Epperson v.

15

Arkansas, 393 U.S. 97, 104 (1968); Woodis, 160 F.3d at 438. A dismissal for disciplinary reasons requires adequate notice, definite charge, and a hearing with an opportunity for the student to present his or her side of the case. Woodis, 160 F.3d at 440.

Here, Henderson was given adequate notice and a definite charge as early as April 5, 2006, when Dr. Olson advised that Henderson would receive an "F" for his internship credits and was subject to dismissal from the program for failing to follow the early separation procedures. Doc. 75 at ¶ 21. Henderson then received hearings where he had a chance to present his version of events. After Henderson filed a grievance with the Equal Opportunity and Diversity Office and Dr. Olson had provided written notice of the failing grade, Henderson participated in a May 4, 2006 meeting during which Dr. Main presented his findings. On May 9, 2006, Henderson participated in a second meeting concerning his status at USD and a possible remedial plan. The meetings on May 4 and 9, 2006 constitute hearings where Henderson had the opportunity to present, and did present, his own side of the case. See Woodis, 160 F.3d. at 440; Richmond, 228 F.3d at 857. Only after these meetings did Dr. Main officially recommend that Henderson receive a failing grade for his internship. On July 13, 2006, USD officials met without Henderson present to evaluate Henderson's performance as a counseling student, resulting in Henderson's dismissal. Although there was no full evidentiary hearing, Henderson, during two separate meetings, was allowed to explain his position and was given the opportunity to provide additional documentation for his claims after the close of the meetings. See Hammock ex rel. v. Keys, 93 F. Supp. 2d 1222, 1227-28 (S.D. Ala. 2000) (finding that allowing student to "answer, explain, and defend" charges is sufficient due process); Fuller v. Decatur Public School Bd. of Educ. School Dist. 61, 78 F. Supp. 2d 812, 822 (C.D. Ill. 2000) (finding sufficient procedural due process when a student was provided an expulsion hearing where he "knew the

16

charges against him, received notice of the expulsion hearing, and was given a full opportunity to explain his position in an evidentiary hearing").

Henderson appealed his dismissal to the South Dakota Board of Regents, but that body did not conduct a new hearing with Henderson present. The South Dakota Board of Regents has responsibility for the operation of all state-supported colleges and universities in South Dakota. Because USD's decision came after Henderson was given notice of the issue and an opportunity twice to be heard prior to USD's dismissal of Henderson from the graduate program, the Board of Regents did not violate due process principles by considering the matter without conducting a de novo hearing

### C. Count 3: Americans with Disability Act

Henderson contends that USD and individual Defendants violated the ADA by not accommodating Henderson's learning disability by, among other things, not allowing Henderson to tape record meetings. Doc. 1. at ¶ 78. Henderson's claims fall under Title II of the ADA because USD is a state funded post-secondary educational institution. 42 U.S.C. § 12131. "Title II of the ADA 'prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity.'" Birmingham v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000) (quoting Randolph v. Rodgers, 170 F.3d 850, 857 (8th Cir. 1999)). However, the ADA does not create "general tort liability for educational malpractice." Smith ex rel. Townsend v. Special Sch. Dist. No. 1 (Minneapolis), 184 F.3d 764, 769 (8th Cir. 1999) (quoting Monahan v. State of Nebraska, 687 F.2d 1164, 1170 (8th Cir. 1982)). To recover from a school under the ADA, a plaintiff must show gross misjudgment or bad faith on the part of school officials. Hoekstra v. Independent

17

Sch. Dist. No. 283, 103 F.3d 624, 626 (8th Cir.1996); Brantley v. Independent Sch. Dist. No.

625, 936 F.Supp. 649, 656 n. 14 (D. Minn. 1996). The effect of this standard is to deny a student

relief unless the school has acted egregiously. Thomas Simmons, The ADA Prima Facie

Plaintiff: A Critical Overview of Eighth Circuit Case Law, 47 Drake L. Rev. 761, 822 (1999).

Eighth Circuit precedent requires Henderson to demonstrate three things in his prima

facie case:

> (1) he is a qualified individual with a disability; (2) he was excluded from
> participation in or denied the benefits of a public entity's services,
> programs, or activities, or was otherwise discriminated against by the
> entity; and (3) that such exclusion, denial of benefits, or other
> discrimination, was by reason of his disability.

Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998) (citations omitted).

Under Title II, Henderson, who has dyslexia, is a qualified individual with a disability

under 42 U.S.C. § 12131. Henderson had disability accommodations provided by USD's

University Disability Center, including separate, distraction-free or minimal distraction testing

locations, extended testing time, use of a reader to assist him with exams, the "option to tape

record lectures," and some flexibility in meeting deadlines particularly when there is a heavy

reading and writing component. Doc. 68-4. Henderson was not denied any benefits or otherwise

discriminated against by USD because of his disability. Henderson's ADA claim rests on Dr.

Korcuska allegedly refusing to allow Henderson to tape record a meeting. Doc. 1 at ¶ 144.

Although Henderson was allowed, under his accommodations, to tape record class meetings,

Henderson's right to tape record did not extend beyond lectures. Doc. 68-4 at 1. Because tape

recording of meetings was not a part of the accommodation of Henderson's dyslexia, and

Henderson has provided no evidence his dyslexia motivated the Defendants' actions against him,

18

Henderson has no viable ADA claim.

Henderson has failed to present any evidence of "gross misjudgment or bad faith" regarding his disability on the part of USD and individual Defendants. Hoekstra, 103 F.3d at 627. Henderson's allegation that the Defendants purposefully scheduled a meeting in a room where audio-recording was not feasible does not demonstrate misjudgment or bad faith. Doc. 75 at ¶ 30. Henderson was not entitled to record the meeting, and an employee of USD took notes during the meeting and made them available to Henderson. Ex. HH5; see Doc. 68-4; Doc. 76-12; Doc. 76-13. Those notes document a conversation during which all parties were able to ask questions and provide answers. Doc. 76-12; Doc. 76-13. The absence of a tape recording of the meeting is not misjudgment or bad faith on the part of USD or any individual Defendant.

### D. Count 4: Harassment of Students

Henderson next alleges that Defendants engaged in "harassment of students." Doc. 1 at ¶ 15. This count is based on Dr. Main allegedly threatening to dismiss Henderson and his partner from USD. Id. at ¶ 144. Neither South Dakota law nor Congress has established a separate cause of action for non-discriminatory generalized "harassment of students." Henderson cites no authority to support such a claim

There is no genuine issue of material fact arising from the alleged threat. The record establishes that Dr. Main informed Henderson that he and his partner had violated patient confidentiality through Henderson's discussions with his partner regarding a client of Keystone. Doc. 76-12 at 4-9. Dr. Main wanted to talk with USD's attorney about the incident and told Henderson of his intentions to do so. Id. at 9. The record stops short of substantiating that Dr. Main threatened to force both Henderson and his partner out of USD. See Doc. 76-12. As this

19

Court has found, Henderson's dismissal was not a breach of contract or in violation of due process. Indeed, making Henderson aware that his status at USD was in jeopardy was proper notice to him. Henderson's partner is not a party to this suit, was not dismissed from USD, and, indeed, received his graduate degree from USD. Henderson has no available claim for "harassment of students."

### E.   Count 5:   Failure to Follow Title IX Protocols in Investigating Sexual Harassment

Henderson alleges that USD misused Title IX protocols in investigating sexual harassment charges and in finding itself blameless. Doc. 1 at ¶ 16. The procedural issue, according to Henderson, is that Ms. Hakl found that Henderson's allegation of sexual harassment while at Keystone had no basis without contacting the witnesses provided by Henderson. Id. at ¶ 151. Henderson also alleges that Dr. Main asked that Henderson "do the right thing" regarding his sexual harassment claims against USD, presumably thereby asking Henderson to drop the chargers.

Henderson cites Fitzgerald v. Barnstable Sch. Committee, 555 U.S. 246 (2009) and a statement by Vice President Joseph Biden about a pronouncement by The United States Department of Education's Office for Civil Rights on April 4, 2011. Doc. 75 at ¶ 15; Letter from Russlyn Ali, Assistant Secretary for Civil Rights, to Colleague, April 4, 2011, available at: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. This Department of Education guidance, however, is aimed primarily at sexual violence perpetrated by one student against another. Id. The document does require that schools employ a preponderance of the evidence standard in evaluating such claims, but Henderson has neither pleaded nor provided

20

evidence to show that USD failed to use a preponderance of the evidence standard in evaluating Henderson's claim of being sexually harassed by a Keystone client. Id. at 11. In addition, the investigation in Henderson's case took place long before the 2011 guidance was issued by the Department of Education.

The Fitzgerald case likewise does not establish that Henderson has a Title IX case here. The issue in Fitzgerald was whether, for a peer-to-peer sexual harassment case, Title IX precluded an action under § 1983 for unconstitutional gender discrimination. 555. U.S. at 248. The Supreme Court held that there was no preclusive effect. Id. at 259. Rather, "Congress intended Title IX to be interpreted similarly to allow for parallel and concurrent § 1983 claims." Id. Under Fitzgerald, Henderson may make claims under both § 1983 and Title IX claims. However, with no showing of any violation of Title IX procedures, Henderson's Title IX claim is subject to summary judgment for the Defendants.

### F. Count 6: FERPA Violations

Henderson's next claim is that the Defendants violated the Family Education Rights and Privacy Act ("FERPA"), 28 U.S.C. § 1232g et seq., by denying Henderson's request for materials in USD's file. Doc. 1 at ¶ 88. Henderson alleges that various individual Defendants denied him photocopies of all documents related to his removal from USD and his progress through the counseling department. Henderson filed a grievance letter with the Family Policy Compliance Office ("FPCO"), but his grievance was denied because he filed after the time for doing so elapsed. Id. at ¶ 157.

Henderson's FERPA claim fails because FERPA cannot be enforced through a private cause of action. Gonzaga University v. Doe, 536 U.S. 273, 295-90 (2002); Pediatric Specialty

21

Care, Inc. v. Arkansas Dept. of Human Services, 443 F.3d 1005, 1014-15 (8th Cir. 2006).

"FERPA provisions fail[] to create privately enforceable rights, since it [has] no explicit 'rights-

creating language,' sp[eaks] in terms of aggregate as opposed to individual privacy protections,

and direct[s] the Secretary of Education to enforce it." Pediatric Specialty Care, Inc., 443 F.3d

at 1015 (quoting Gonzaga, 536 U.S. at 290).

### G. Count 7: Educational Malpractice

Henderson's next claim, for "educational malpractice," asserts a fiduciary relationship,

and breach of that relationship between Henderson and Defendants Dr. Korcuska and Dr. Olson.

Doc. 1 at ¶¶ 18, 158-65. Henderson cites a case from Louisiana about educational malpractice,

Miller v. Loyola Univ. of New Orleans, 829 So.2d 1057 (La. Ct. App. 2002), but cites no South

Dakota law supporting such a cause of action. The Supreme Court of South Dakota has never

recognized nor addressed a claim of educational malpractice. See 1 A.L.R.4th 1139. When a

state court has not spoken on an issue, a federal court must "attempt to predict what that court

would decide if it were to address the issue." Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co.,

118 F.3d 1263, 1268 (8th Cir. 1997). In making that prediction, a federal court may consider

"relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data."

Id. (quoting Ventura v. Titan Sports, Inc., 65 F.3d 725, 729 (8th Cir. 1995).

Previously, this Court has found sound public policy reasons for rejecting educational

malpractice as a cognizable tort action in South Dakota. These are:

> (1) the lack of a satisfactory standard of care by which to evaluate an
> educator; (2) the inherent uncertainties about causation and the nature of
> damages in light of such intervening factors as a student's attitude,
> motivation, temperament, past experience, and home environment; (3) the
> potential for a flood of litigation against schools; and (4) the possibility
> that such claims will embroil the courts into overseeing the day-to-day

22

operations of schools.

Sheesley v. The Cessna Aircraft Co., CIV. 02-4185-KES, 2006 WL 1084103, at *17 (D.S.D. Apr. 20, 2006) (citing Page v. Klein Tools, Inc., 610 N.W.2d 900, 903 (Mich. 2000)).

This Court predicts that the Supreme Court of South Dakota would not recognize educational malpractice as a cognizable cause of action. With the lone exception of Montana, courts "have unanimously failed to recognize a cause of action for educational malpractice." Moore v. Vanderloo, 386 N.W.2d 108, 114 (Iowa 1986); see also Sellers ex rel. Sellers v. Sch. Bd. of City of Manassas, Va., 960 F.Supp. 1006, 1012-13 (E.D. Va. 1997) (stating that "there is overwhelming judicial authority in opposition" to recognition of educational malpractice claims); Moss Rehab. v. White, 692 A.2d 902, 906 (Del. 1997) (stating that at least ten states and the District of Columbia have refused to recognize educational malpractice claims). Therefore, Defendants' motion for summary judgment is granted with respect to the tort claim brought under educational malpractice.

### H. Count 8: Barred from Readmission into Alternate Program; Breach of Contract

In Count Eight of the Complaint, Henderson claims that he was barred from readmission to USD in a different masters program despite exceeding all requirements for admission. Doc. 1 at ¶ 19. Henderson alleges that Defendants thereby breached a contract with him by violating USD's policy on admission. Id. at ¶ 167. However, subject to the limitations imposed by the Constitution, institutions of higher education are accorded wide discretion in making admissions decisions. "Under the aegis of academic freedom, a university may 'determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" Yarcheski v. Reiner, 2003 SD 108, 669 N.W.2d 487, 497 (quoting Sweezy

23

v. New Hampshire, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)).  In admitting graduate students, subjective factors such as "motivation, maturity, and demonstrated humanitarian qualities are valid considerations." Szejner v. University of Alaska, 944 P.2d 481, 485 (Alaska, 1997); see also Lucas v. Hahn, 162 Vt. 456 (Vt. 1994); McDonald v. Hogness, 92 Wash.2d 431, 448 (Wash. 1979).

Henderson cited various cases in his pleadings, but none of those cases are helpful to his cause. Henderson has not presented evidence to create a genuine dispute of any material fact that the decision to not readmit Henderson was somehow "discriminatory, arbitrary, or unreasonable." See 14A C.J.S. Colleges and Universities § 31.  As a matter of law, Defendants had no contractual obligation under the circumstances to Henderson to readmit him to a different graduate program.  Therefore, Henderson's claim that a contract was breached when Defendants denied his readmission into USD is subject to summary judgment in favor of the Defendants.

## V. Conclusion

Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 64) is granted.

Dated September 12, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

24